IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

_____

ALFRED JOHN HAFLICH,

                     Plaintiff,

           vs.

OFFICER ROBERT MCLEOD, In his
official and individual capacities, and
THE CITY OF TROY POLICE
DEPARTMENT,

                    Defendants.

CV 09-161-M-DWM-JCL

FINDINGS AND
RECOMMENDATION OF
UNITED STATES
MAGISTRATE JUDGE

_____

This matter is before the Court upon Defendant Robert McLeod's Motion
for Summary Judgment filed pursuant to Fed. R. Civ. P. 56.  For the reasons
discussed below, the Court recommends that McLeod's motion should be denied.

I.    **BACKGROUND**

This action stems from Defendant Officer Robert McLeod's conduct in
effecting the arrest of Plaintiff Alfred Haflich on November 23, 2007, in Troy,
Montana.  Most of the material events of the arrest are not genuinely in dispute by
the parties, except where noted below.

1

Officer McLeod was a police officer employed by the City of Troy at the time of the events described herein.  Shortly after 2:00 a.m. on November 23, 2007, Officer McLeod was dispatched to investigate a theft of beer that occurred at the Town Pump convenience store in Troy.  A short time later, McLeod initiated a stop of a vehicle that matched the description of the vehicle believed to be used in connection with the theft.[1]

McLeod engaged Haflich who was the driver, and the passenger who was Devin Boos.  Smelling alcohol on Haflich's breath, and observing Haflich's lack of coordination and slurred speech, McLeod directed Haflich to perform a field sobriety test.  Haflich complied with McLeod's directive and ultimately failed the test.  At some point, Haflich also complied with McLeod's request for a breath sample, which indicated a blood alcohol content in excess of the legal limit for driving a motor vehicle.

McLeod arrested Haflich, handcuffing Haflich's hands in front of his body.

---

[1]Officer McLeod's patrol car was equipped with a video camera that recorded the events surrounding Haflich's arrest.  The parties have each supplied the Court with a duplicate copy of the camera recording.  The camera captured most of the video images of the course of the arrest and all of the audio of the communications between McLeod and Haflich.  But the camera was facing forward out the front windshield of the patrol car and, therefore, the camera did not capture the video images of the events that transpired in the back seat of the patrol car.  Thus, only some limited facts can be confirmed by the audio and video tracks of the recording.

McLeod advised Haflich that if he was not compliant McLeod would then handcuff Haflich's hands behind his back.  McLeod also "ensured Haflich's pockets were empty of anything that could be used as a weapon[.]"  Dkt. # 28 at ¶ 23.  McLeod placed Haflich in the back of his patrol car and fastened the seatbelt around Haflich.  McLeod then went back to Haflich's vehicle to question Haflich's passenger, Boos, about the suspected theft.  At some point McLeod called a tow truck to pick up Haflich's vehicle.

After dealing with Boos, McLeod returned to his patrol car.  McLeod observed that the seatbelt "was no longer on Haflich and that the handcuffs had almost been removed from one of his hands."  Dkt. # 28 at ¶ 27.  Consequently, McLeod handcuffed Haflich's hands behind his back and again fastened the seatbelt around Haflich at that time.  Haflich denies that he was attempting to remove his hands from the handcuffs.

While McLeod was assisting the driver of the tow truck that had arrived at the scene, he heard Haflich being disruptive in the patrol car.  McLeod returned to the patrol car to find Haflich upset about having to incur the cost of the tow truck.  Haflich argued with McLeod and requested McLeod call Haflich's wife to retrieve the vehicle so Haflich would not incur the expense of the vehicle being towed.  Haflich yelled at, and used profanity against McLeod.

3

At some point in time, McLeod was in the front seat of his patrol car attempting to communicate with dispatch to advise that he would be en route to the Libby jail.  Haflich, still upset about the prospect of incurring a towing charge, continued to yell at McLeod.  McLeod instructed Haflich to be quiet so he could use his radio, but Haflich ignored McLeod's instruction and continued his tirade. Haflich concedes that in response to McLeod's instructions he stated the following:  "Fuck you, I have my rights, I ain't no punk, I ain't no degenerate." Dkt. # 49-3.  The audio recording from the camera reflects that during this interaction McLeod communicated to dispatch that he was "en route."

McLeod then exited the patrol car and opened the back door.  McLeod asserts that after he opened the door "Haflich then swung his legs towards the door, leading [McLeod] to believe Haflich was going to kick [him]."  Dkt. # 28 at ¶ 37.  Haflich denies that he swung his legs towards the door or that he was attempting to kick McLeod.  There is no mention on the audio recording about Haflich swinging his legs or trying to kick McLeod.

The audio recording does reflect that while McLeod was at the rear door of the patrol car, he asked Haflich, "Are you gonna be quiet while I talk on the radio?"  In response Haflich said, "Nope."  At that point McLeod tasered Haflich. McLeod states he delivered one drive stun to Haflich with an X26 Taser.  Haflich

4

asserts he was handcuffed and seat belted in the patrol car at the time McLeod

tasered him.  McLeod does not dispute this assertion.  Haflich also asserts McLeod

did not warn him he would be tasered, and the audio recording confirms that

McLeod did not issue any warning about using a taser.  McLeod states Haflich

then settled down and became compliant.  McLeod used his radio to inform

dispatch he was en route to the Libby jail, and McLeod transported Haflich to jail.

 During the course of the traffic stop, McLeod was able to confirm Haflich

was the suspect from the theft at Town Pump store.  Haflich was subsequently

charged with both theft and driving under the influence of alcohol.  Haflich states

that he pled guilty to driving under the influence, and the theft charge was

dismissed.

 Haflich's Amended Complaint filed on May 25, 2010, advances claims

against McLeod based on McLeod's use of a taser on Haflich. Haflich alleges

McLeod is liable under 42 U.S.C. § 1983 for his excessive use of force on Haflich

in violation of Haflich's rights protected under the Fourth Amendment to the

United States Constitution.  Haflich also alleges McLeod is liable for committing

the torts of assault and battery against Haflich.  Finally, Haflich alleges the City of

Troy is liable under § 1983 for violations of his constitutional rights, and is liable

under the doctrine of respondeat superior with respect to McLeod's assault and

battery.

## II.   APPLICABLE LAW - SUMMARY JUDGMENT STANDARDS

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986).  Once the moving party has satisfied his burden, he is entitled to summary judgment if the non-moving party fails to designate by affidavits, depositions, answers to interrogatories or admissions on file, "specific facts showing that there is a genuine issue for trial." *Id*., 477 U.S. at 324.

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Additionally, "the court may not weigh the evidence or make credibility determinations[]" to resolve the motion.  *Freeman v.*

6

*Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), abrogated on other grounds as noted in

*Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

## III.   DISCUSSION

McLeod moves for summary judgment dismissing Haflich's claim of

excessive use of force advanced against McLeod under 42 U.S.C. § 1983 on the

ground that he is entitled to qualified immunity from liability.  The parties have

submitted supplemental briefs in view of the Ninth Circuit Court of Appeals' June

18, 2010 decision in *Bryan v. MacPherson*, ___ F.3d ___, 2010 WL 2431482 (9th

Cir. 2010).  The decision in *Bryan* addressed issues of qualified immunity and

excessive use of force claims similar to those presented in this case.  Upon review

of *Bryan* and the applicable qualified immunity analysis, for the reasons discussed

below the Court finds McLeod has failed to sustain his summary judgment burden

of establishing his entitlement to qualified immunity.

The doctrine of qualified immunity provides a public official with immunity

from liability in a civil action for damages, provided his or her conduct does not

violate clearly established federal statutory or constitutional rights of which a

reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982).  The doctrine provides "immunity from suit rather than a mere defense to

liability[.]"  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

7

The analysis employed in determining whether a government official is entitled to qualified immunity consists of two inquiries. First, "[t]aken in the light most favorable to the party asserting the injury, [the court must consider whether] the facts alleged show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no constitutional violation is established then no further inquiry is necessary. *Id*.

Second, if a violation of a constitutional right can be found, then the court must consider whether the right at issue, in the context of the facts and circumstances of the case, was clearly established. *Saucier*, 533 U.S. at 201. Under this inquiry, a defendant may be shielded from liability if his or her "actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow*, 457 U.S. at 818).

The court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, __ U.S. __, 129 S. Ct. 808, 818 (2009). Here, the Court finds it appropriate to address both prongs of the

analysis in the order suggested under *Saucier*.[2]

## A. <u>Violation of a Constitutional Right</u>

A law enforcement officer's conduct in effecting an arrest is constrained by the terms of the Fourth Amendment's prohibition on unreasonable seizures. *Bryan v. MacPherson*, ___ F.3d ___, 2010 WL 2431482, *2 (9th Cir. 2010); *Graham v. Connor*, 490 U.S. 386, 394 (1989). Although the Fourth Amendment "does not prohibit a police officer's use of reasonable force during an arrest[]" (*Tatum v. City and County of San Francisco*, 441 F.3d 1090, 1095 (9th Cir. 2006), the use of "force is only justified when there is a need for force." *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007).

A claim of excessive use of force in connection with a law enforcement officer's arrest of a citizen is analyzed under the Fourth Amendment's objective reasonableness standard. *Saucier*, 533 U.S. at 204. The court must consider "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or

_____

[2]In his motion McLeod initially asserted his entitlement to qualified immunity based only on the second prong of the analysis under *Saucier*. In response to the motion, however, Haflich argues the facts in this case establish that McLeod violated his constitutional rights under the Fourth Amendment thereby addressing the first prong of the analysis. In turn, McLeod also addressed the merits of Haflich's claim in McLeod's reply brief.

motivation." *Graham*, 490 U.S. at 397.  The reasonableness of the force used is judged from the "perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 490 U.S. at 396.  Ultimately, the substance of the analysis requires the court to balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id*. (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).  "Stated another way, we must 'balance the amount of force applied against the need for that force.'" *Bryan*, 2010 WL 2431482 at *2 (internal citation omitted).

### 1.    <u>Nature and Quality of the Intrusion</u>

McLeod states that the force he applied to Haflich was "one drive stun to Haflich's side with an X26 Taser[.]"  Dkt. # 28 at ¶ 38.  Haflich states that when McLeod applied the taser he felt like he "was being stabbed by knives, that [his] body was paralyzed, and that [his] life seemed in danger."  Dkt. # 49-3 at ¶ 46.  Haflich also states he has scars on his side from the taser.  *Id*.

The drive-stun mode "involves touching the Taser to the body [which] causes temporary, localized pain only[,]" "without incapacitating muscle contractions or [causing] significant lasting injury." *Brooks v. City of Seattle*, 599 F.3d 1018, 1026, 1127 (9th Cir. 2010).  Although the use of a taser qualifies as

"non-lethal force," that does not equate to "non-excessive" force. *Bryan*, 2010 WL 2431482 at *3. All force "must be justified by the need for the specific level of force employed [...] in [each] specific factual situation." *Id*. The Ninth Circuit considers the use of a taser in drive-stun mode to be a "pain compliance technique[]" (*Brooks*, 599 F.3d at 1027 n.14), and has characterized the quantum of force from the drive-stun mode as a "serious intrusion" on an individual's Fourth Amendment interests, but "less than the intermediate[]" level of force. *Id*. at 1128.

## 2.   **Governmental Interest**

The federal courts assess "the government's interest in the use of force by examining three core factors" as follows:

> [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

*Bryan*, 2010 WL 2431482 at *5 (quoting *Graham*, 490 U.S. 396). The foregoing does not constitute an exclusive list of factors. Rather, the courts consider additional factors in the "totality of the circumstances" to objectively determine "the amount of force that is necessary in a particular situation." *Bryan*, 2010 WL 2431482 at *5 (citation and quotation omitted).

### a.    Severity of the Crimes

McLeod argues the offenses Haflich committed - theft and driving under the influence of alcohol - were not mere nonviolent, misdemeanor offenses.  With respect to the theft, McLeod contends Haflich brazenly stole the beer by telling the store clerk he was going to just take it since the clerk could not sell it to Haflich after 2:00 a.m.

Also, with respect to the charge of driving under the influence of alcohol, McLeod states the dispatch officer informed McLeod that Haflich had three prior convictions for driving under the influence.  Thus, the circumstances McLeod faced that night potentially involved Haflich's fourth offense making it a felony offense under Montana law.  *See* Mont. Code Ann. § 61-8-731(1).

Despite the theft and the fact that Haflich's fourth conviction for driving under the influence would be a felony, the severity of the offenses as asserted by McLeod did not justify McLeod's use of force under the circumstances of this case.  It is undisputed that Haflich was handcuffed and seat belted in the back seat of the patrol car at the time McLeod tasered Haflich.  Therefore, because Haflich was already in custody and physically restrained inside the patrol car when he was tasered by McLeod, the severity of the crimes was irrelevant to the need to use force.  Although the severity of an offense may justify the use of force to take a

12

person into custody and effect an arrest, that factor, standing alone, becomes irrelevant once the person is in custody.

In any excessive use of force case, the use of "force must be necessary to be reasonable[.]" *Brooks v. City of Seattle*, 599 F.3d 1018, 1025 (9th Cir. 2010). Thus, where a police officer has "control over a suspect, the use of further force to bring the suspect under control may be unreasonable." *Id.* (citing *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002)). In *Headwaters* the court concluded that the officers' use of pepper spray on nonviolent protesters who, by their own volition, had physically restrained their arms in a metal, self-releasing lock-down device called a "black bear" constituted the excessive use of force in violation of the Fourth Amendment. 276 F.3d at 1127-30.

Similarly, McLeod's use of force against Haflich when Haflich was already in custody weighs against the government's interest in the use of force. The governmental interest in effecting Haflich's arrest was already satisfied by the time McLeod employed the taser. McLeod's assertion regarding the severity of the crimes does not justify the use of force against a person who is in custody.

**b.   <u>Officer Safety</u>**

The most important factor under *Graham* is the issue of whether the

plaintiff "posed an 'immediate threat to the safety of the officer.'" *Bryan*, 2010 WL 2431482 at *5 (citation omitted).  An officer's concern for safety, however, must be supported by objective factors which identify an immediate threat.  *Id*.

McLeod suggests Haflich posed a threat when McLeod opened the rear door of the patrol car.  He asserts Haflich swung his legs towards the door, and McLeod believed Haflich was going to kick him.  The audio recording from the video camera in the patrol car, however, does not provide any objective support to McLeod's belief that Haflich tried to kick him.  The audio recording does not reflect that McLeod said anything to Haflich about any attempted kicking.

In addition to the absence of objective factors to support McLeod's belief, Haflich asserts in his affidavit that he did not attempt to kick McLeod.  Accordingly, there is at least a genuine issue of material fact as to whether Haflich threatened McLeod's safety in such a manner so as to justify McLeod's use of the taser.

With the exception of the factual dispute regarding whether Haflich kicked at McLeod, the balance of the circumstances of this case suggest Haflich did not pose an immediate threat to McLeod's safety.  McLeod contends he was at risk on the basis that (1) the arrest occurred in the middle of the night, (2) McLeod was alone without backup officers, (3) Haflich was intoxicated, upset, belligerent and

14

not compliant, and (4) Haflich had previously attempted to slip his handcuffs off and had unbuckled his seatbelt.  The significant flaw in McLeod's contention, however, is that despite the forgoing factors that may have posed some threat to McLeod at some point in time during the course of his encounter with Haflich, those factors did not give rise to an immediate threat to McLeod's safety contemporaneous to the moment when McLeod discharged the taser.  Rather, it is undisputed that at the time McLeod employed the taser, Haflich was unarmed, handcuffed with his hands behind his back, and seat belted sitting in the rear seat of McLeod's patrol car.  Other than the disputed attempted kick, McLeod does not point to any other physical threat made by Haflich, or any physical resistence committed by Haflich at any time during the course of the arrest.  At most, McLeod confronted a situation involving an intoxicated, upset and verbally belligerent individual, but "not an immediately threatening one." *Bryan*, 2010 WL 2431482 at *6.

McLeod also argues his use of force was necessary because Haflich interfered with his ability to communicate with the dispatch officer on the radio. While it is clear that Haflich was yelling and using profanity while McLeod was on the radio, the record in this case contradicts McLeod's assertion that Haflich interfered with McLeod's communication.  Although McLeod states he

15

"attempted" to call dispatch on the radio to advise he was en route to the jail, the audio recording from the patrol car camera clearly establishes that McLeod successfully completed that specific communication.  The audio recording reflects that McLeod told dispatch he was en route before he exited the patrol car and employed the taser on Haflich.  Thus, Haflich did not interfere with McLeod's communication as McLeod contends.

Nonetheless, even if McLeod could demonstrate that Haflich interfered with his radio communications or his duties in some manner, there is no evidence in the record suggesting that the asserted interference posed a threat to McLeod's safety. McLeod's communication - informing dispatch that he was en route to the jail - does not objectively raise a concern of any immediate threat to officer safety.  The communication was administrative, and not emergent, in nature.  McLeod was not, for example, attempting to communicate with dispatch to seek immediate medical assistance, officer backup, or to obtain any other assistance to address some fact or circumstance that McLeod was confronting that threatened his safety.

McLeod also contends Haflich refused to comply with his instruction given to Haflich to be quiet while he was on the radio, thereby justifying his use of force. *See Brooks*, 599 F.3d at 1029 (finding plaintiff's non-compliance with instructions posed some threat to the officers during the course of the plaintiff's arrest).  The

16

non-compliance in *Brooks* supporting the use of force under the circumstances of that case occurred during the course of the officers' attempt to remove the individual from a vehicle and arrest her.  The plaintiff's non-compliance occurred before the officers effected her arrest and took her into custody.  599 F.3d at 1021.

Unlike *Brooks*, Haflich's non-compliance did not occur during the course of McLeod's efforts to take Haflich into custody.  Instead, Haflich was already in physical custody when he refused to comply with McLeod's instructions.  Again, there is no evidence suggesting that Haflich's non-compliance - refusing to be quiet while McLeod was using the radio - threatened McLeod's safety.  Haflich was handuffed and seat belted in the back seat of the patrol car, and McLeod successfully communicated to dispatch that he was en route to the jail.

### c. <u>Actively Resisting or Evading Arrest</u>

The third factor - resisting or evading arrest - takes into consideration whether the plaintiff was actively resisting arrest or attempting to flee thereby justifying the use of force to effect the arrest.  *See Brooks*, 599 F.3d at 1029; *Bryan*, 2010 WL 2431482 at *8.  Here, Haflich was not resisting arrest or attempting to flee from an impending arrest at the time McLeod tasered him. Instead, Haflich was already under arrest and in physical custody.  Thus, this factor weighs against any use of force under the circumstances of this case.

### d.   <u>Totality of the Circumstances - Additional Factors</u>

The reasonableness of an officer's conduct is evaluated under the totality of the circumstances.  Therefore, two additional factors are relevant and weigh against a finding that McLeod's use of the taser was reasonable.  First, an officer's failure to warn an individual that the application of force by the use of a taser was imminent is an important factor to consider.  *Bryan*, at *9; *Brooks*, 599 F.3d at 1030.  Here it is undisputed that McLeod did not issue any verbal warning advising Haflich that he would be tasered if he refused to be quiet.

Second, law enforcement officers are obligated to consider other tactics that may be available to effect an arrest.  *Bryan*, at *9.  Under the circumstances of this case "there were clear, reasonable, and less intrusive alternatives" available to McLeod.  *Id*.  McLeod successfully communicated to dispatch that he was en route to the jail, and he thereafter could have chosen to ignore Haflich's yelling and profanity.  Haflich was already physically restrained in the patrol car ready to be transported to jail.  Simply taking Haflich to jail would have abrogated the need to use the taser on Haflich.

### 3.   <u>Balancing the Competing Interests</u>

Review of the factors identified in *Graham* reflects that the governmental interest in McLeod's use of force under the circumstances of this case is virtually

18

non-existent.  Except for the disputed issue of fact as to whether Haflich attempted

to kick McLeod, there is no evidence of any governmental interest in, or need for

the use of force on Haflich.  "It is the need for force which is at the heart of the

*Graham* factors."  *Bryan*, at *10 (citation and quotation omitted).  Absent any

need for force, there exists no justification for the intrusion inflicted on Haflich's

Fourth Amendment interest in this case.

Therefore, in the context of McLeod's summary judgment motion, the Court

finds he has failed to demonstrate the absence of genuine issues of material fact

which would affirmatively establish that he did not use excessive force against

Haflich in violation of Haflich's constitutional rights.  The evidence in this case,

viewed in the light most favorable to Haflich, at least raises genuine issues of

material facts, but also could support a finding of excessive force.  Thus, summary

judgment in McLeod's favor is precluded both on the merits of the excessive use

of force issues and the first prong of the qualified immunity analysis.  *See Smith v.

City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005), and *Lolli v. County of Orange*,

351 F.3d 410, 421-22 (9th Cir. 2003).  Accordingly, the Court will proceed to

consider the second prong of the qualified immunity analysis.

## B.  Clearly Established Right

Notwithstanding the fact that a jury could conclude that McLeod violated

19

Haflich's constitutional right to be free from the excessive use of force, McLeod

would be entitled to qualified immunity if his conduct was premised on a

reasonable belief that the force he used was lawful under the circumstances he

faced. *Bryan*, at *10.  The qualified immunity analysis requires the Court to

consider whether McLeod's conduct "violate[d] clearly established statutory or

constitutional rights of which a reasonable person would have known."  *Bryan*, at

*10 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).[3]  Qualified

immunity protects "all but the plainly incompetent or those who knowingly violate

the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The immunity also protects

an officer from liability even if he "makes a decision that [...] reasonably

misapprehends the law governing the circumstances [the officer] confronted."

*Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

    An officer's entitlement to qualified immunity turns on the officer's

violation of a right of which a reasonable officer would have known.

> [Q]ualified immunity operates "to ensure that before they are subjected to
> suit, officers are on notice their conduct is unlawful." [...]  For a
> constitutional right to be clearly established, its contours "must be
> sufficiently clear that a reasonable official would understand that what he is
> doing violates that right.  [...]"

---

[3]Resolution of the issue of qualified immunity is purely a question of law.
*Mitchell v. Forsyth*, 472 U.S. 511, 528 n.9 (1985).

*Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation omitted).[4]  To be held liable an

officer must have "fair warning" that certain conduct is unconstitutional.  *Id*. at

739-41.  Thus, the Court must review the state of the law as it existed at the time

the alleged unconstitutional conduct took place to determine the scope of the

rights that were clearly established.  *Bryan*, at *10 (citation omitted).

McLeod argues he is entitled to qualified immunity under this second prong

of the *Saucier* analysis.  He contends that the law regarding the use of tasers

during an arrest, regardless of the circumstances the officer faced, was not

sufficiently developed and clear so as to put him on notice that his conduct would

be clearly unlawful.

As a general proposition, the decisional law applicable to the use of a taser

is developing and, as of November 23, 2007, was "not sufficiently clearly

established to warrant denying officers qualified immunity."   *Bryan*, 2010 WL

2431482 at *11 (citing *Brown v. City of Golden Valley*, 574 F.3d 491, 498 n. 5 (8th

Cir. 2009); *Mattos v. Agarano*, 590 F.3d 1082, 1089-90 (9th Cir. 2010); *Brooks v.

City of Seattle*, 599 F.3d 1018, 1031 n.18 (9th Cir. 2010) (noting plaintiff had "not

---

[4]In the context of an excessive use of force claim qualified immunity
operates "to protect officers from the sometimes 'hazy border between excessive
and acceptable force.'"  *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (quoting
*Priester v. Riviera Beach*, 208 F.3d 919, 926-927 (11th Cir. 2000)).

shown that the use of a Taser in drive-stun mode in overcoming her resistance to arrest violated a clearly established constitutional right")).  McLeod's position, however, misses the mark as to the proper identification of the particular clearly established right at issue in this case.

A court's conclusion as to the applicable legal standard that is clearly established need not always be based on "closely analogous case law" decisions. *Bryan*, at *11.  "It is not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of an officer's action] was apparent in light of preexisting law."  *Moreno v. Baca*, 431 F.3d 633, 641 (9th Cir. 2005) (quoting *Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002)).  *See also Hope v. Pelzer*, 536 U.S. 730, 739 (2002).

> [W]hen an officer's conduct "is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established."

*Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004) (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1286 (9th Cir. 2001)).  In a case of an obvious violation of a constitutional right, a broad and general statement of the right can be sufficient, by itself, to "clearly establish" the right.  *Brosseau*, 543 U.S. at 199.  "[O]fficials can still be on notice that their conduct violates established law even

in novel factual circumstances." *Hope*, 536 U.S. at 741.

Although the law regarding the use of a taser is not clearly established as McLeod asserts, the clearly established right at issue in this case is not uniquely defined by or tied to the use of a taser, irrespective of the other circumstances surrounding McLeod's use of the taser.  Rather, the "dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

The applicable clearly established right is a citizen's right "to be free from excessive use of force under the facts and circumstances presented in this case." *Brown v. City of Golden Valley*, 574 F.3d 491, 499 (8th Cir. 2009); *Graham*, 490 U.S. at 396.  Specifically, "it is clearly established that force is least justified against nonviolent [offenders] who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public[, and] whose only noncompliance with the officer's commands was to disobey" orders concerning matters that do not pose a threat to officer safety.  *Brown*, 574 F.3d at 499 (citing *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1287 (10th Cir. 2007) (citing *Graham*, 490 U.S. at 396)).

The only matter asserted by McLeod presenting a viable issue regarding his safety is the issue of whether Mcleod was at risk of being kicked by Haflich.  But

23

Haflich denies kicking McLeod, and the audio recording does not reflect that Haflich tried to kick McLeod. In the context of a motion for summary judgment on the issue of qualified immunity the Court must "view all facts and draw all reasonable inferences in favor of the nonmoving party[.]" *Brosseau*, 543 U.S. at 195 n.2.

Again, under the circumstance of this case construed in Haflich's favor, Haflich was handcuffed and seat belted in the rear seat of McLeod's patrol car at the time McLeod tasered him without warning. No reasonable officer confronting these circumstances - where the need for force is nonexistent - could reasonably have concluded his conduct was constitutionally permitted. The law is clearly established that "where there is no need for force, *any* force used is constitutionally unreasonable." *Headwaters Forest Defense v. County of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000) (emphasis is original), vacated on other grounds, *County of Humboldt v. Headwaters Forest Defense*, 534 U.S. 801 (2001). Thus, prior to November 23, 2007, it was clearly established that where a police officer has physical control over a suspect, and there is no need for any further force, then the use of force is clearly unconstitutional. *See Brooks v. City of Seattle*, 599 F.3d 1018, 1025 (9th Cir. 2010) (citing *Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002)).

24

## IV.   CONCLUSION

For the reasons discussed, McLeod has failed to establish he is entitled to qualified immunity under the circumstance he confronted while arresting Haflich. Because Haflich was unarmed and physically restrained in the rear seat of a patrol car at the time McLeod tasered Haflich, the facts, viewed in the light most favorable to Haflich, could support a conclusion that McLeod violated Haflich's constitutional right to be free from the excessive use of force.  Furthermore, Haflich's rights under the circumstances of this case were clearly established giving McLeod fair notice that the use of force, in the absence of evidence justifying any need for force, was unconstitutional.  Therefore, IT IS RECOMMENDED that McLeod's Motion for Summary Judgment be DENIED.

DATED this 2nd day of August, 2010.


 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge

25