## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

_____

ALFRED JOHN HAFLICH,

              Plaintiff,

      vs.

OFFICER ROBERT MCLEOD, In his
official and individual capacities, and
THE CITY OF TROY POLICE
DEPARTMENT,

              Defendants.

CV 09-161-M-DWM-JCL

FINDINGS AND
RECOMMENDATION OF
UNITED STATES
MAGISTRATE JUDGE

_____

## I.    INTRODUCTION

      This action stems from the November 23, 2007 arrest of Plaintiff Alfred

Haflich by Defendant Robert McLeod, a police officer with the City of Troy,

Montana.  Haflich was arrested for stealing beer from a local convenience store

and driving under the influence.  During the course of the arrest, McLeod tased

Haflich once in the rib cage with an X26 taser in "stun-drive" mode.  The tasing

followed Haflich's failure to heed McLeod's directive to remain quiet while

McLeod radioed dispatch.  At the time of the tasing, Haflich was seat belted in the

rear of McLeod's patrol vehicle with his hands handcuffed behind his back.

Haflich brings this action against McLeod and the City of Troy under 42 U.S.C. § 1983 alleging McLeod used unreasonable and excessive force to effect his arrest in violation of the Fourth Amendment of the United States Constitution. Haflich also advances state-law claims for assault and battery.

The City of Troy moves for summary judgment on the § 1983 claim advanced against it by Haflich.  The City contends it is entitled to judgment as a matter of law because Haflich has failed to establish that McLeod's alleged violation of his Fourth Amendment rights can be attributed to the enforcement of a City policy, practice, or decision of a final policymaker – an essential element of municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978).  For the reasons detailed below, the City's motion should be granted only with respect to Haflich's theory of recovery based on ratification, but should be denied in all other respects.

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A party moving for summary judgment who does not have the burden of persuasion at trial, must produce evidence which either:  (1) negates an essential element of the non-

2

moving party's claim, or (2) shows that the non-moving party does not have enough evidence of an essential element to ultimately carry his burden at trial. *Nissan Fire & Marine Ins. Co. Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

Once the moving party has satisfied its burden, the non-moving party must go beyond the pleadings and designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986).  A party opposing summary judgment must identify evidence establishing that a dispute as to a particular material fact is genuine.  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The opponent "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*.  The party opposing the motion "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "genuine" if there is sufficient evidence for a reasonable fact finder to find for the non-moving party.  *Anderson*, 477 U.S. at 248-49.  A fact is "material" if it may affect the outcome of the case.  *Id*. at 248.

"In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), abrogated on other grounds as noted in *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

## III.   DISCUSSION

42 U.S.C. § 1983 provides a cause of action for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  Municipal entities may be liable under § 1983, but not on a respondeat superior theory.  *Monell*, 436 U.S. at 690-694.  Rather, it is only when "the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy[]'" that the municipality is responsible under § 1983.  *Ulrich v. City and County of San Francisco,* 308 F.3d 968, 984 (9th Cir. 2002) (quoting *Monell*, 436 U.S. at 694).  Thus, to hold a municipality liable under *Monell*, the plaintiff must prove three elements:  (1) the existence of an official policy or custom that (2) caused the plaintiff to be subjected to (3) the denial of a constitutional right.  *Conn v. City of Reno*, 591 F.3d 1081, 1102 (9th Cir. 2010) (citations omitted).  The courts must

strictly adhere to the stringent requirements for imposing § 1983 liability under

*Monell* so that liability is not imposed based on the doctrine of respondeat

superior.  *See City of Canton v. Harris*, 489 U.S. 378, 392 (1989).

> Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.

*Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 405

(1997).

In the absence of an expressly adopted official policy "there are three ways

to show a policy or custom of a municipality:  (1) by showing 'a longstanding

practice or custom which constitutes the 'standard operating procedure' of the

local government entity'; (2) 'by showing that the decision-making official was, as

a matter of state law, a final policymaking authority whose edicts may fairly be

said to represent official policy in the area of decision'; or (3) 'by showing that an

official with final policy making authority either delegated that authority to, or

ratified the decision of, a subordinate.'"  *Rosenbaum v. City and County of San*

*Francisco*, 484 F.3d 1142, 1155 (9th Cir. 2007) (quoting *Ulrich*, 308 F.3d at 984-

85) (internal quotation marks and citation marks omitted).  To constitute the

standard operating procedure of the local government entity, the custom or

practice must be "so persistent and widespread," and  "so permanent and well

settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436

U.S. at 691; and *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (citation

omitted).

> Liability for improper custom may not be predicated on isolated or sporadic
> incidents; it must be founded upon practices of sufficient duration,
> frequency and consistency that the conduct has become a traditional method
> of carrying out policy.

*Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (citation omitted).

A policy is "'a deliberate choice to follow a course of action made from

various alternatives by the official or officials responsible for establishing final

policy with respect to the subject matter in question'." *Fairley v. Luman*, 281 F.3d

913, 918 (9th Cir. 2002) (per curium) (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477

(9th Cir. 1992)) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).

A policy or custom can be one of action or inaction. *Long v. County of Los*

*Angeles,* 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *City of Canton*, 489 U.S. at

388). Acts of "omission" may provide the basis for municipal liability under §

1983 when the "omissions amount to the local government's own official policy."

*Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010) (citation

omitted). To impose liability on a municipality for acts of omission, the omission

must amount to "deliberate indifference to a constitutional right." *Id*. This

standard is met when the need to act "is so obvious, and the inadequacy so likely

to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* (quoting *City of Canton*, 489 U.S. at 390).

Municipal liability based on ratification requires a "showing that an official with final policymaking authority [...] ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier*, 591 F.3d at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992)).  Authorized policymakers' "ratification would be chargeable to the municipality because their decision is final." *Clouthier*, 591 F.3d at 1250 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)).  The evidence must demonstrate, however, that a conscious, deliberate choice to ratify conduct is made from among various alternatives. *Clouthier*, 591 F.3d at 1250 (citations and quotations omitted).

To ultimately sustain a *Monell* claim, the plaintiff must show a sufficient causal connection between enforcement of the municipal policy or practice and the violation of the plaintiff's federally protected right by proving that enforcement of the policy or practice was the "moving force" behind the violation. *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166 (1993); *City of Canton*, 489 U.S. at 385 (recognizing there must be "a direct causal

link between a municipal policy or custom and the alleged constitutional deprivation").

Haflich advances two general theories of liability against the City of Troy under *Monell*.  First, Haflich contends the City of Troy, through then Mayor James Hammons, engaged in a longstanding custom of deliberate indifference to McLeod's use of excessive force against the citizens of Troy.

Second, Haflich contends the City of Troy is liable under a theory of ratification.  He argues that the City of Troy, in part through Mayor Hammons, ratified both the improper conduct committed by McLeod at various times prior to Haflich's arrest, as well as McLeod's use of force against Haflich.

The City of Troy argues it is entitled to summary judgment with respect to both of Haflich's theories.

### 1.   Failure to Act - Deliberate Indifference to McLeod's Conduct

Haflich argues the City of Troy is liable under § 1983 and *Monell* based on an alleged longstanding custom or practice of deliberate indifference to numerous incidents of misconduct by McLeod.  Specifically, he contends Hammons repeatedly refused, or failed to take appropriate corrective action against McLeod. For the reasons detailed below, the Court finds Haflich has established the existence of genuine issues of material facts as to whether the City of Troy had a

longstanding custom of remaining deliberately indifferent to McLeod's use of excessive force.

Haflich identifies two categories of evidence in support of his custom or practice theory.  The first category relates to evidence of conduct by McLeod, not regarding use of excessive force, but pertaining generally to his fitness as a police officer.  The second category consists of evidence of McLeod's use of force against individuals and the City's response.  The Court will address the two categories separately.

As a preliminary matter the Court notes that liability under § 1983 could be imposed against the City of Troy by virtue of Hammons' conduct as the Mayor and authorized policymaker for the City.  The issue of whether any particular "official has final policymaking authority is a question for the court to decide based on state law." *Christie v. Iopa*, 176 F.3d 1231, 1235, 1235 (9th Cir. 1999) (citing *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989)). Montana law provides that a mayor "has charge of and supervision over the police department."  Mont. Code Ann. § 7-32-4103.  The mayor "may suspend or remove any member or officer of the [police] force."  *Id*.  Thus, former Mayor Hammons was the authorized policymaker for the City of Troy in the area of supervising or disciplining police officers in Troy.  The City does not argue otherwise.

### a.   McLeod's Unrelated Prior Conduct

Haflich first relies on incidents of McLeod's prior conduct that are unrelated to the excessive use of force alleged in this action.  Haflich points to the fact that soon after McLeod began his employment with the City of Troy in 2005, one of McLeod's former fellow officers, Kit Pearson, "became concerned about McLeod's conduct as an officer[.]"  Affidavit of Kit Pearson (July 10, 2010) at ¶ 10 (Dkt. 90-8).[1]  Pearson states McLeod's conduct towards his colleagues and arrestees was "combative and erratic[.]"  Dkt. 90-8 at ¶ 12.  Pearson was also particularly concerned about McLeod's "emotional[] stability."  Dkt. 90-8 at ¶ 10.  Pearson states he conveyed his concerns to the then Chief of Police, Mitchell Walters.

Other allegations of McLeod's improper conduct as a police officer arose in late October of 2007.  Walters states he received information from Pearson that

---

[1]The parties have each submitted various documents and exhibits in support of their respective positions on the pending summary judgment motion.  The parties, however, have not established the authenticity and admissibility of all of the various exhibits.  A summary judgment ruling "may only be based on admissible evidence."  *In re Oracle Corporation Securities Litigation*, 2010 WL 4608794, *3 (9th Cir. 2010).  The party seeking the admission of any particular piece of evidence bears the burden of establishing its authenticity and admissibility.  *Id*.  The parties have not met their burden with respect to all of the evidence offered for consideration by the Court.  Therefore, the Court will rely only upon the affidavits submitted to the Court, or other evidence found to be admissible.

McLeod had "randomly targeted citizens at the IGA by shining his taser light on them improperly." Affidavit of Mitch Walters (November 8, 2010) at ¶ 3 (Dkt. 90-7). Additionally, a woman complained to Walters that McLeod came to her place of employment at a gas station and "targeted her with his taser light through the glass of the building[.]" Dkt. 90-7 at ¶ 8.

Walters states he expressed his concerns to Hammons regarding the foregoing conduct and incidents, and recommended to Hammons that he implement some form of progressive discipline, or terminate McLeod. But according to Walters, Hammons "refused to consider any form of discipline, refused to consider terminating McLeod," and "attempted to dissuade [Walters] from even communicating [Walters'] concerns to McLeod." Dkt. 90-7 at ¶¶ 7-8. *Id*. Walters asserts that despite a written reprimand he prepared concerning McLeod, Hammons decided that no action needed to be taken against McLeod. Dkt. 90-7 at ¶ 8.

The referenced incidents of McLeod's purported conduct pertain generally to his fitness as a police officer. The information Walters presented to Hammons regarding the incidents did not raise any issue concerning the use of excessive force by McLeod against a detainee, and did not identify a plainly obvious need to take corrective action to prevent McLeod from using excessive force in effecting

arrests.  Hammons' failure to take corrective action with respect to unrelated

subject matters does not constitute deliberate indifference to a known or obvious

risk of a Fourth Amendment violation, and cannot qualify as the moving force

behind McLeod's conduct towards Haflich.  The "causal link between

[Hammons'] failure to address [McLeod's] deficient performance in other aspects

of his job and his [violation of Haflich's Fourth Amendment right] here is tenuous

at best."  *Conn v. City of Reno*, 591 F.3d 1081, 1104 (9th Cir. 2010).  The

referenced information, taken as true, is not sufficient to satisfy the rigorous

standards of culpability and causation necessary to qualify as a custom or practice

of indifference that would subject the City of Troy to liability under § 1983.

     The record further reflects that Hammons did in fact reprimand McLeod

with respect to the incident where McLeod shined his taser light into a building.

In support of its motion the City of Troy submitted a copy of Hammons' October

29, 2007, written decision regarding that incident which reflects that Hammons

reviewed:  (1) Walters' October 11, 2007, written reprimand against McLeod

stemming from the incident, and (2) McLeod's appeal of the reprimand.  Dkt. 82-

8.  The City and Haflich have both referred to, and relied upon Hammons' October

29, 2007, decision in support of their respective positions on the pending summary

judgment motion.  Dkt. 82 at ¶ 32; Dkt. 90 at 5 (referring to "City Exhibit H").  In

his decision Hammons agreed "[t]here was no reason for" McLeod's conduct, and that the conduct "could result in bodily injury."  Dkt. 82-8 at 1.  Hammons adopted Walters' recommendation and instructed McLeod "to use a laser sighting system in a professional manner, respect and take caution in the use, and to assure that it is not directed toward any person[']s eyes."  *Id*.   Finally, Hammons referred to his decision as a "reprimand."  *Id*.  Because Hammons reprimanded McLeod, the evidence, viewed in light most favorable to Haflich, does not suggest that Hammons was deliberately indifferent to the need to take corrective action.

### b.   <u>Custom or Practice of Deliberate Indifference to Incidents of McLeod's Use of Force</u>

Normally, the issue of whether a custom or practice exists is a question of fact for the jury to resolve.  *Trevino v. Gates*, 99 F.3d 911, 920 (9th Cir. 1996). The quantum of evidence sufficient to demonstrate the existence of a custom or practice is not firmly established as a matter of law.  *See e.g. Jarbo v. County of Orange*, 2010 WL 3584440, * 11-12 (C.D. Cal. 2010) (surveying the sufficiency of evidence in several case law decisions supporting either the existence or nonexistence of a custom or practice).

Evidence of only two incidents of unconstitutional acts, standing alone, has been found to be insufficient to support the existence of a longstanding practice or custom which constitutes the standard operating procedure of the local

government entity.  *See Meehan v. County of Los Angeles*, 856 F.2d 102, 107 (9th

Cir. 1988) (evidence of two incidents of "unconstitutional assaults [...] standing

alone" was insufficient); and *Jarbo*, 2010 WL 3584440, * 12 (evidence of two

incidents of excessive use of force by one officer, together with a failure to take

corrective action against the officer, was insufficient).  Similarly, absent additional

facts demonstrating the existence of a true custom or practice under the standards

discussed in *Trevino*, supra, a "single failure to discipline" an officer, by itself,

cannot give rise to a municipality's liability under *Monell*.  *Haugen v. Brosseau*,

351 F.3d 372, 393 (9th Cir. 2003), reversed on other grounds *Brosseau v. Haugen*,

543 U.S. 194 (2004).

In contrast, where there exists additional evidence extending beyond just the

unconstitutional act or acts of a defendant, a broader custom or practice can be

inferred.  Although a municipality cannot be held liable based only on the

unconstitutional acts of its law enforcement officers, those acts may reflect the

existence of a widespread custom or practice if there exists "evidence of repeated

constitutional violations for which the errant municipal [officers] were not

discharged or reprimanded."  *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir.

1992).  *See also Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).

Post-event evidence may also be relevant and admissible "to prove the existence

of a municipal policy in effect at the time" the constitutional injury was inflicted on the plaintiff.  *Henry v. County of Shasta*, 132 F.3d 512, 518 (9th Cir. 1997).

Haflich argues he has presented sufficient evidence of Hammons' indifference to McLeod's use of force against detainees to raise a genuine issue of material fact as to whether the indifference constituted a policy or custom of the City of Troy.  The Court agrees.

### (1)    Two Prior Incidents

Haflich first identifies two specific incidents — predating Haflich's arrest — in which McLeod threatened to deploy a taser against detainees.  Haflich contends Hammons failed to take appropriate corrective action in response to the two incidents.[2]  The first incident, as reported to Walters by police officer Edward Reuther, involved McLeod threatening to tase a man who was already arrested and handcuffed in the back seat of a patrol car.  Affidavit of Mitch Walters (July 9, 2010) at ¶ 14 (Dkt. 90-6).  Officer Pearson describes a second incident he witnessed where McLeod threatened to tase a young man.  Pearson states that McLeod drew his taser, grabbed the young man "and slammed him face down onto

---

[2]The Court notes Haflich also makes a passing reference to allegations that McLeod bragged that he used a taser on more people than any other law enforcement officer in Lincoln County, and that the City of Troy failed to take any action to address this issue.  Haflich, however, does not identify any evidence in support of his allegations.

the hood of [Pearson's] patrol car, put his taser into the man's ribs," and threatened to tase him.  Dkt. 90-8 at ¶ 11.

Walters states that because he concurred with Reuther and Pearson's concerns as to McLeod's stability and fitness to continue as a peace officer he "wrote to [Hammons] requesting that McLeod be required to undergo a thorough psycological [sic] evaluation and that he not be returned to duty in the mean time." Dkt. 90-6 at ¶ 16.  Specifically, Walters states he engaged in a discussion with Hammons concerning the two incidents where McLeod threatened to use a taser on individuals.  Dkt. 90-7 at ¶ 7.  Walters requested that Hammons consider disciplining or terminating McLeod.  But, according to Walters, Hammons refused to support any of Walters' requests.  *Id*.[3]

### (2)    The Haflich Incident

Haflich next points to Hammons' alleged failure to take appropriate corrective action against McLeod in response to Haflich's complaint.  It is undisputed that Haflich did not file any complaint against McLeod until November 13, 2009, and there is no evidence in the record indicating Hammons

---

[3]In response to the evidence of these two prior incidents, the City of Troy argues only that the matters were not brought to Hammons' attention.  Walters, however, clearly states in his November 8, 2010 affidavit that he "discussed each of these incidents" with Hammons, and Hammons refused to take any corrective action.  Dkt. 90-7 at ¶ 7.

was aware of McLeod's conduct towards Haflich prior to November 13, 2009.

The parties also agree that on or about November 17, 2009, officials of the City of

Troy met with McLeod to discuss Haflich's complaint.  Dkt. 82-3 at 4.  An audio

recording of the meeting has been filed in the record.

During the referenced meeting Hammons stated he did not want to have to

do anything in response to Haflich's complaint against McLeod — Hammons

initially said "forget it, we're not doing anything." Dkt. 90 at 7.[4]  Haflich argues

that Hammons was instead forced by others to confront McLeod and address the

situation.[5]  Because Lincoln County and a prosecutor had gotten involved

Hammons said he was forced into "a position to do something I don't wanna

do[.]" *Id*.  But, "I have to act, to protect you, to protect the City, to protect all of

_____

[4]Walters explains he understood that Hammons "did not wish to take any
action against McLeod because he did not want the hassle of dealing with a
personnel issue just months before he was to leave office."  Dkt. 90-5 at ¶ 12.
Regardless of the reason for Hammons' conduct, the evidence of record supports
Haflich's contention that Hammons initially declined to take corrective action
against McLeod.

[5]The parties agree that as of the time of the November 2009 meeting with
McLeod, Hammons had not viewed the DVD recording of McLeod's arrest of
Haflich.  Dkt. 90 at 8; Dkt. 82 at ¶ 33.  Haflich asserts this fact is further evidence
of Hammons' conduct in turning a blind eye to McLeod's unlawful conduct.
While this fact may have evidentiary value at trial, Haflich has already sufficiently
established that Hammons initially refused to take corrective action against
McLeod, and the fact is not necessary to the Court's resolution of the City's
motion.

us[.]" *Id.* at 8.  Consequently, on November 17, 2009, Hammons put McLeod "on

administrative leave" pending the investigation after initially refusing to take

action on November 13, 2009, when Hammons learned of McLeod's conduct.  *Id.*

at 7.[6]

### (3)  Official Review of the Haflich Incident

Haflich next focuses on a written decision issued with respect to McLeod's

conduct in tasing Haflich.  The parties agree that a three-member panel was

convened to review Haflich's Complaint against McLeod.[7]  On December 3, 2009,

the panel issued a written decision concluding that McLeod's conduct was

appropriate and professional, and that McLeod did not use excessive force.  Dkt.

82 at ¶ 35; Dkt. 90 at 5-6.  Haflich argues the panel's decision constitutes evidence

---

[6]In addition to placing McLeod on administrative leave, the record also reflects that following receipt of Haflich's complaint, Walters prepared a Memorandum of Written Reprimand with respect to McLeod's use of the taser on Haflich, and Walters identified violations of five policies committed by McLeod. Dkt. 90-6 at ¶ 17.  The reprimand was signed by Hammons, Walters, and the City Clerk.  Affidavit of Mitch Walters (June 12, 2010) at ¶ 13 (Dkt. 90-5).  Thus, despite his initial refusal to respond to Haflich's complaint, the Court recognizes Hammons ultimately did take corrective action against McLeod.  Nonetheless, a question of fact remains as to whether Hammons' initial refusal to take action is probative of deliberate indifference on Hammons' part as alleged by Haflich.

[7]There exists no evidence in the record establishing that the three-member panel was an authorized policymaker acting on behalf of the City of Troy.  The City does not argue, however, that the panel was not an authorized policymaker. Therefore, the Court will accept it as an authorized policymaker for purposes of addressing the City of Troy's motion.

of the City of Troy's custom or practice of deliberate indifference to McLeod's excessive use of force.[8]

Viewing the referenced evidence in a light most favorable to Haflich, the Court is compelled to conclude that when considered collectively, the evidence is sufficient to raise a genuine issue of material fact as to the existence of a custom or practice followed by Hammons or the City of Troy.  The evidence raises an inference that McLeod's conduct towards Haflich was "not an aberration or deviation from 'standard operating procedure' but [was] instead in conformity with" a custom or practice attributable to the City of Troy.  *Jarbo*, 2010 WL 3584440, * 12.  Thus, the Court finds there exists sufficient evidence in this case upon which a reasonable jury could conclude that McLeod's excessive use of force, and Hammons or the City of Troy's deliberate indifference to that use of force was "of sufficient duration, frequency and consistency that the conduct [had become] a traditional method of carrying out policy," and had become the City of Troy's "standard operating procedure."  *Trevino*, 99 F.3d at 918 (citation omitted). "[I]f the evidence is such that a reasonable jury could return a verdict for the

---

[8]The City of Troy fails to advance any argument regarding the evidentiary value of the three-member panel's decision.  Specifically, the City does not present any argument as to why the decision would not constitute evidence of the City's custom or practice of deliberate indifference to the excessive use of force in existence at the time of the incident that is the subject of this action.

19

nonmoving party[,]" then summary judgment must be denied.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### 2.   Ratification of McLeod's Conduct

As an alternative theory of liability, Haflich contends Hammons ratified McLeod's prior conduct as a police officer, and that the City of Troy ratified McLeod's conduct towards Haflich at issue in this case.  Haflich's theory, however, is not viable because the evidence of Hammons' conduct does not qualify as a ratification under § 1983 law.

As discussed above, strict standards apply to a ratification theory of liability under § 1983.  A policymaker must cast a subordinate's conduct "in the form of a policy statement [that is] expressly approved by the supervising policymaker[.]" *Gillette*, 979 F.2d at 1348 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)).  Absent evidence that the policymaker "made a conscious, affirmative choice to approve [the officer's] actions and adopt them as official policy[,]" liability cannot be imposed on the municipality.  *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1253 (9th Cir. 2010).  The policymaker must deliberately choose to "endorse" the subordinate's conduct and the basis for it "before the policymaker will be deemed to have ratified the subordinate's discretionary decision." *Gillette*, 979 F.2d at 1348.  A mere failure "to overrule

the unconstitutional discretionary acts of subordinates[,]" without expressly

endorsing or approving of the conduct, is an insufficient predicate for the

imposition of liability against the municipality.  *Id.*

Haflich argues that Hammons' conduct in refusing to take corrective action

against McLeod for any of McLeod's conduct prior to the incident in question

constitutes ratification.  Those prior circumstances, however, do not constitute

ratification sufficient to impose liability on the City of Troy.  There is no evidence

that Hammons expressly approved or endorsed any of McLeod's conduct as

representative of the City's official policy.  Hammons' conduct, at best, qualifies

as nothing more than his mere failure to overrule McLeod's prior discretionary

actions.

As an alternative theory of liability based on ratification, Haflich contends

the above-referenced December 3, 2009 panel decision not only constitutes

evidence of a custom or practice, but also constitutes ratification of McLeod's

conduct.[9]  For the reasons stated below, however, the evidence does not establish

that the panel's decision qualifies as a ratification under § 1983.

---

[9]"Liability based on custom is different from liability based on

ratification[.]"  *Trevino*, 99 F.3d at 918 n.2.  In contrast to a custom or practice, a

single act of ratification can be one of the rare situations where an isolated

incident may be sufficient to impose liability on a municipality.  *Id.*; *Christie v.

Iopa*, 176 F.3d 1231, 1235, 1238 (9th Cir. 1999).

21

A single subsequent ratification of the very conduct that gave rise to the plaintiff's lawsuit can, where properly found to exist, support the imposition of liability. *Haugen v. Brosseau*, 351 F.3d 372, 393 (9th Cir. 2003). Although a subsequent ratification obviously cannot have "caused the earlier" constitutional violation, liability can still be imposed where the plaintiff shows that the decision was the product of a "conscious, affirmative choice" to ratify the conduct in question, and the decision is "tantamount to the announcement or confirmation of a policy for purposes of *Monell*[.]" *Id. See also Grandstaff v. City of Borger, Texas*, 767 F.2d 161 (5th Cir. 1985).

In *Grandstaff*, the subject of the action involved an "incompetent and catastrophic performance" of police officers who discharged a barrage of gunfire killing an innocent person. In response to the incident the city did not reprimand or discharge any officers, it made no admissions of error, and it made no changes to police department policies. *Grandstaff*, 767 F.2d at 171. The court concluded that "[i]f that episode of such dangerous recklessness obtained so little attention and action by the City policymaker, the jury was entitled to conclude that it was accepted as the way things are done and have been done in the City of Borger." *Id*. Thus, the City's subsequent response "to so gross an abuse of the use of

deadly weapons" as displayed in that case was evidence of the City's policy as it existed prior to, and at the time of the incident in question.  *Id*.

As recognized in *Haugen* and *Grandstaff*, a ratification must be accompanied by other extenuating or egregious circumstances before liability can be imposed.  There must exist "something more" than the mere evidence "that a policymaker concluded that the defendant officer's actions were in keeping with the applicable policies and procedures."  *Garcia v. City of Imperial*, 2010 WL 3911457, *2 (S.D. Cal. 2010) (citing *Kanae v. Hodson*, 294 F. Supp. 2d 1179, 1191 (D. Hawaii 2003) and *Larez v. City of Los Angeles*, 946 F.2d 630, 646-648 (9ᵗʰ Cir. 1991)).

In *Larez*, for example, the additional circumstances beyond the ratification itself that qualified as "something more" included (1) an obviously flawed and ineffective investigation conducted by the same police unit that was under investigation, (2) the police department's long history of consistently refusing to sustain citizen complaints about police officers' excessive use of force making it "almost impossible for a police officer to suffer discipline as a result of a complaint lodged by a citizen," and (3) the police department's longstanding policy or custom of resorting to the use of excessive force.  *Larez*, 946 F.2d at 647. The court concluded those additional circumstances were sufficient to impose

liability on the City of Los Angeles based on the Chief of Police's subsequent ratification of the conduct at issue in the lawsuit. 946 F.2d at 648. The evidence establishing that the authorized policymaker "made, or ratified a decision that deprived plaintiffs of their constitutional rights [was sufficient] for [both] official liability [and municipal liability] under *Pembaur*." 946 F.2d at 646.

In this case, there exists no evidence of any other extenuating circumstances surrounding the December 3, 2009 panel decision that constitute "something more" in support of Haflich's ratification theory. There is no evidence describing the investigation conducted by the three-member panel or the adequacy of that investigation. The evidence does not establish that the decision was the product of a conscious, affirmative choice to "ratify" McLeod's conduct, or that the decision was tantamount to the confirmation of a policy. Also, unlike *Larez*, there is no evidence that the City of Troy's police officers regularly resorted to the excessive use of force in effecting arrests, or that the City of Troy engaged in a long history of ignoring citizens' complaints about the excessive use of force employed by police officers in effecting arrests. Consequently, the three-member panel's alleged post-event ratification of McLeod's conduct is not sufficient to subject the City of Troy to liability in the absence of "something more." *See Garcia*, 2010

24

WL 3911457, *2 and *Kanae*, 294 F. Supp. 2d at 1189.  The City of Troy's motion should be granted in this respect.

## IV.   CONCLUSION

Haflich has raised genuine issues of material facts, and has identified sufficient evidence on which a reasonable jury could conclude the City of Troy engaged in, or implemented a custom or practice of deliberate indifference to the excessive use of force employed by McLeod in violation of the Fourth Amendment.  He has failed, however, to present sufficient evidence in support of his ratification theory of recovery.

Therefore, IT IS RECOMMENDED that the City of Troy's Motion for Summary Judgment on 42 U.S.C. § 1983 Claims be GRANTED with respect to Haflich's ratification theory, and should be DENIED in all other respects.

DATED this 29th day of December, 2010.


 /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge